# UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF MICHIGAN
### SOUTHERN DIVISION

JOHN DOE (1-3) a/k/a MICHAEL HELISEK,
SCOTT HUMMEL and CHRISTOPHER
GRODZICKI,

      Plaintiffs,

                                Case No. 06-CV-12369-DT

v.

                                HONORABLE DENISE PAGE HOOD

DEARBORN PUBLIC SCHOOLS and
GAIL LYNN SHENKMAN,

      Defendants.

_____/

## MEMORANDUM OPINION AND ORDER
## AND
## NOTICE OF FINAL PRE-TRIAL CONFERENCE

## I.      BACKGROUND/FACTS

Plaintiffs Michael Helisek, Scott Hummel and Christopher Grodzicki allege in their

Complaint, removed to this Court by Defendants, Dearborn Public Schools and Gail Lynn

Shenkman, principal of Dearborn High School, that Defendants violated MICH. COMP. LAWS §

750.539d, Count I; committed Invasion of Privacy, Count II; intentionally inflicted emotional

distress upon Plaintiffs, Count III; violated 42 U.S.C. § 1983 by violating Plaintiffs' Fourth

Amendment right to be free from unreasonable searches, Count IV; and committed gross negligence,

Count V.[1]

Plaintiffs are tenured male physical education teachers employed by Dearborn Public

---

[1] On June 16, 2006, the Plaintiffs' moved for this Court to issue a Protective Order to proceed pseudonymously. On August 30, 2006, the Court denied Plaintiffs' Motion.

Schools at Dearborn High School. Plaintiffs initiated the instant matter after a student discovered the presence of a hidden video camera within the staff office which was located inside, but separated from, the male locker room at the high school. Access to the office is available by way of two doors, one door, which remains locked at all times, leads to the training room, which is also enclosed within the boys' locker room, and the other door leads to the boys locker room. (Plfs.' Br. in Opp'n to Defs.' Mot. for Summ. J., Ex. J) The door that leads to the boys locker room is locked when no staff is in the office. (*Id.* at Exs. B, C and D) However, when staff are in the office the door is unlocked and left open so that students may freely enter and confer with their physical education instructors. (Defs.' Mot. for Summ. J., Deposition of Scott Hummel) The office also has two windows that look out onto the boys' locker room.

In 2004-2005, the high school was experiencing thefts from the boys' locker room. Defendants claim that a pattern was starting to emerge indicating that the thefts were occurring during the fifth hour period, which was Plaintiff Helisek's preparation time. Mr. Michael Shelton, Assistant Principal, testified that he became concerned that Plaintiff Helisek was involved in the thefts. (Shelton Dep., pp. 14, 29-31) Mr. Shelton approached Defendant Shenkman and the police liaison about his concerns. They agreed that a hidden camera would be installed in the office. (Shenkman Dep., pp. 27-28) Defendant Shenkman believed that the camera would catch Plaintiff Helisek, or the other teachers, when they placed the objects taken from the boys' lockers into their desks. (Shelton Dep., pp. 36-37) Defendant Shenkman directed the security director, Don Ball, to install the cameras in the offices. Two cameras were placed in the office. (Ball Dep., pp. 61-62)

Mr. Ball testified that in 2005 and 2006, there was only one monitor, which was part of a DVR, to monitor all the video cameras in the school, including the security cameras which covered

the parking lots and corridor areas. (Ball Dep., pp. 78-80) The monitor was located in the main office copy room and could display images from the concealed camera and the other various cameras around the building. (Ball Dep., pp. 56, 64) Mr. Ball testified that the first DVR (Model 7000) had 16 slots, one for each camera. (Ball Dep., pp. 79-80) The 7000 DVR was later replaced with two 8000 DVRs in 2006. Each 8000 DVR also had 16 slots; the two 8000 DVRs had the capacity to monitor 32 cameras. (Ball Dep., pp. 79-80) When he left on May 16, 2005, there were no images of the Plaintiffs' office being shown since he did not plug in the video surveillance from this particular video camera. (Ball Dep., p. 96) Although the school installed two new upgraded DVRs in February 2006, Mr. Ball testified that the lead from the camera in the Plaintiffs' office was not plugged into the DVR, therefore, no image of the office was being shown. (Ball Dep., pp. 97-98) Mr. Ball testified that the system does record live images on the disc but that the storage capacity was 30 days. (Ball Dep., p. 57) This meant that on the 31st day, the 1st day was recorded over and that the "looping" is automatic. (Ball Dep., p. 57) The images from the DVR could be recorded or burned onto a CD. (Ball Dep., p. 75) The three persons who had access to the security system were Defendant Shenkman, Mr. Ball, and Mr. Shelton. (Shenkman Dep., pp. 67-68)

Mr. Shelton testified that there was a request to have the data captured by the camera in Plaintiffs' office deleted. (Shelton Dep., p. 43) Mr. Shelton testified that he remembers seeing an image of Plaintiff Helisek sitting at his desk in his office on the monitor. (Shelton Dep., p. 44)

On March 10, 2006, a student entered Plaintiffs' office and saw the camera in the ceiling tile. Upon learning of the camera, Plaintiffs Helisek and Hummel went to Defendant Shenkman's office to complain about the camera. (Hummel Dep., p. 27) Defendant Shenkman discussed the situation with the Director of Human Resources, Thomas D. Rafferty, and a decision was made to remove the

cameras. (Rafferty Dep., pp. 33-34)

This matter is before the Court on Defendants' Motion for Summary Judgment. Plaintiffs filed a Brief in Opposition to Defendants' Motion for Summary Judgment and a reply was filed to the response. Plaintiffs also filed a Motion for Leave to File Supplemental Complaint. A response and reply to the response were filed  A hearing was held on the matter.

## II.    ANALYSIS

### A.    Standard of Review

Rule 56 of the Rules of Civil Procedure states that summary judgment is to be entered if the moving party demonstrates there is no genuine issue as to any material fact. Fed. R. Civ. P. 56. The Supreme Court has interpreted this to mean that summary judgment should be entered if the evidence is such that a reasonable jury could find only for the moving party. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 249 (1986). The moving party has "the burden of showing the absence of a genuine issue as to any material fact." *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 157 (1970); *see also Lenz v. Erdmann Corp.*, 773 F.2d 62 (6th Cir. 1985). In resolving a summary judgment motion, the Court must view the evidence in the light most favorable to the non-moving party. *See Duchon v. Cajon Co.*, 791 F.2d 43, 46 (6th Cir. 1986); *Bouldis v. United States Suzuki Motor Corp.*, 711 F.2d 1319 (6th Cir. 1983). But as the Supreme Court wrote in *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986):

> [T]he plain language of Rule 56(c) mandates the entry to summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial. In such a situation, there can be "no genuine issue as to any material fact," since a complete failure of proof concerning an essential element of the nonmoving party's case necessarily renders all other facts immaterial. The moving party is "entitled to a judgment as a matter of law" because the nonmoving party has failed to make a

sufficient showing on an essential element of her case with respect to which she has the burden of proof.

477 U.S. at 322-23.  To create a genuine issue of material fact, the nonmovant must do more than present "some evidence" of a disputed fact.  "If the [nonmovant's] evidence is merely colorable, or is not significantly probative, summary judgment may be granted."  *Anderson*, 477 U.S. at 249-50 (citations omitted).  Accordingly, a nonmovant "must produce evidence that would be sufficient to require submission to the jury of the dispute over the fact."  *Mathieu v. Chun*, 828 F. Supp. 495, 497 (E.D. Mich. 1993) (citations omitted).

**B.    Plaintiffs' § 1983 claim (Count IV)**

**1.    Qualified Immunity - Defendant Shenkman**

**a.    Law**

Defendants claim that Defendant Shenkman is entitled to qualified immunity.  Plaintiffs' brief states that Defendant Shenkman directed the actual placement and ultimate removal of the cameras.  (Pl.'s Br., pp. 11-12)  Plaintiffs do not expressly address *qualified* immunity under § 1983 in their response brief, only *governmental* immunity under M.C.L. § 691.1407 for state law violations.  Qualified and governmental immunities are two separate defenses and require two separate analysis.

Government officials are entitled to *qualified* immunity where their actions do not "violate clearly established statutory or constitutional rights of which a reasonable person would have known."  *Green v. Reeves*, 80 F.3d 1101, 1104 (6th Cir. 1996) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  A government official will not be immune if, on an objective basis, it is obvious that no reasonably competent officer would have concluded that [the action at issue was lawful]; but if the officer of reasonable competence could disagree on this issue, immunity should be recognized.

*Malley v. Briggs*, 475 U.S. 335, 341 (1986). Qualified immunity is an initial threshold question the court is required to rule on early in the proceedings so that the costs and expenses of trial are avoided where the defense is dispositive. *Saucier v. Katz,* 533 U.S. 194, 201 (2001). Qualified immunity is "an entitlement not to stand trial or face the other burdens of litigation." *Mitchell v. Forsyth*, 472 U.S. 511, 526 (1985). The privilege is "an immunity from suit rather than a mere defense to liability; and like an absolute immunity, it is effectively lost if a case is erroneously permitted to go to trial." *Id.*

The first inquiry to determine qualified immunity is, taken in the light most favorable to the party asserting the injury, do the facts alleged show the official's conduct violated a constitutional right. *Siegert v. Gilley,* 500 U.S. 226, 232 (1991). "To successfully state a claim under 42 U.S.C. § 1983, a plaintiff must identify a right secured by the United States Constitution and the deprivation of that right by a person acting under color of state law." *Russo v. City of Cincinnati,* 953 F.2d 1036 (6th Cir. 1992). The following requirements must be met: (1) the conduct at issue must have been under color of state law; (2) the conduct must have caused a deprivation of constitutional rights; and (3) the deprivation must have occurred without due process of law. *Nishiyama v. Dickson County,* 814 F.2d 277, 279 (6th Cir. 1987). As § 1983 is not itself a source of substantive rights, and only a method for vindicating federal rights elsewhere conferred, a plaintiff must set forth specific constitutional grounds for asserting a § 1983 claim. *Graham v. Connor,* 490 U.S. 386, 393-94 (1989); *Baker v. McCollan,* 443 U.S. 137, 144 n. 3 (1979).

If no constitutional right would have been violated, there is no necessity for further inquiries concerning qualified immunity. *Saucier,* 533 U.S. at 201. If a violation could be made out, the next step is to determine whether the right was clearly established in light of the specific context of the

6

case, not as a broad general proposition. *Id.* Under the doctrine of qualified immunity, an official

will not be found personally liable for money damages unless the official's actions violate "clearly

established statutory or constitutional rights of which a reasonable person would have known."

*Harlow,* 457 U.S. at 818. The "clearly established" rights allegedly violated by the official cannot

be considered at an abstract level, but must be approached at a level of specificity, "[t]he contours

of the right must be sufficiently clear that a reasonable official would understand that what he is

doing violates that right." *Anderson v. Creighton,* 483 U.S. 635, 639 (1987). "Reasonableness" is

a question of law to be decided by the trial court. *Jeffers v. Heavrin*, 10 F.3d 380 (6th Cir. 1993).

### b.      Constitutional Right

Plaintiffs meet the first requirement of a § 1983 claim against Defendant Shenkman because

there is no dispute that Defendant Shenkman is a state actor in her capacity as the principal of

Defendant Dearborn Public Schools.

The second requirement discussed in this section is whether Plaintiffs have stated a

constitutional violation. Defendants assert that Plaintiffs did not have a reasonable expectation of

privacy in their office. Plaintiffs claim they have a reasonable expectation of privacy in their office

and an expectation not to be video taped in their office.

The Fourth Amendment, applicable to the States through the Fourteenth Amendment's Due

Process Clause, prohibits government actors from conducting unreasonable searches and seizures.

*New Jersey v. T.L.O.*, 469 U.S. 325, 334-35 (1985). The occurrence of a "search" is defined in

terms of whether a person had a "constitutionally protected reasonable expectation of privacy." *Katz*

*v. United States,* 389 U.S. 347 (1967) When interpreting the *Katz* definition, a "reasonable

expectation of privacy" exists when: (1) "the individual [has] manifested a subjective expectation

of privacy in the object of the challenged search" and (2) "society [is] willing to recognize that expectation as reasonable." *California v. Ciraolo,* 476 U.S. 207, 211 (1986).

The second prong of the *Katz* test generally addresses two considerations. The first consideration focuses on "what a person had an expectation of privacy *in,* for example, a home, office, phone booth or airplane." *Dow Chemical Co. v. United States,* 749 F.2d 307, 312 (6th Cir.1984); *see also Oliver v. United States,* 466 U.S. 170, 178 (1984) (noting "our societal understanding that certain areas deserve the most scrupulous protection from government invasion"); *United States v. White,* 401 U.S. 745, 786 (1971) (Harlan, J., dissenting) (assessing "the individual's sense of security"). This inquiry centers on "whether the human relationships that normally exist at the place inspected are based on intimacy, confidentiality, trust or solitude and hence give rise to a 'reasonable' expectation of privacy." *Dow Chemical Co.,* 749 F.2d at 312.

The second consideration of the second prong examines "what the person wanted to protect his privacy *from,* for example, non-family members, non-employees of a firm, strangers passing by on the street or flying overhead in airplanes." *Id.* (emphasis in original); *see also Oliver,* 466 U.S. at 178 (discussing "government invasion" and "arbitrary government interference"); *White,* 401 U.S. at 762 (asking whether, in a particular situation, "self-restraint by law enforcement officials [is] an inadequate protection"). This inquiry, therefore, focuses on the government intrusion at issue. The United States Supreme Court has held that the Fourth Amendment governs the conduct of school officials and that searches and seizures by government employees or supervisors of the private property of their employees are subject to the constraints of the Fourth Amendment. *O'Connor v. Ortega,* 480 U.S. 709, 715-17 (1987). The Supreme Court has acknowledged that society recognizes that a person enjoys a reasonable expectation of privacy in an office, even in a shared office. *Id.* at

716-17.

Addressing the first prong of the *Katz* test, Plaintiffs have established subjective expectations of privacy in the object of the challenged search. Plaintiffs claim they are entitled to privacy in their office and/or locker room.

As to the second prong of the *Katz* test, Plaintiffs have sufficiently provided evidence that they have an expectation of privacy *in* their locker room/office and *from* the students and other staff members to change or to do some office work. The locker room/office contains lockers provided by the school so that Plaintiffs could change their clothes. The locker room/office can only be accessed from the boys' locker room and is contained within the boys' locker room. Plaintiffs use the office at least three times a week to change their clothes from street clothes to athletic clothes and to disrobe in order to shower after conducting physical education classes or working out in the school's fitness room. (Ex. B, Grodzicki Dep.; Ex. C, Hummel Dep.; Ex. D, Helisek Dep.) The office was for the exclusive use of the male physical education teachers. (Ex. E, Rafferty Dep.) Even if the Plaintiffs did not use the office to change their clothes, Plaintiffs still had a reasonable expectation of privacy in the office, as noted by the Supreme Court in *O'Connor*, in light of the fact that the office was a room contained in the boys' locker room and was for the exclusive use of the male physical education teachers.

Regarding the issue of the reasonableness of the search, "[d]etermining the reasonableness of any search involves a twofold inquiry: first, one must consider 'whether the ... action was justified at its inception,' *Terry v. Ohio,* 392 U.S. [1], at 20; second, one must determine whether the search as actually conducted 'was reasonably related in scope to the circumstances which justified the interference in the first place,' *ibid.*" *T.L.O.,* 469 U.S. at 341. Ordinarily, a search of

an employee's office by a supervisor will be "justified at its inception" when there are reasonable grounds for suspecting that the search will turn up evidence that the employee is guilty of work-related misconduct, or that the search is necessary for a noninvestigatory work-related purpose such as to retrieve a needed file. The search will be permissible in its scope when "the measures adopted are reasonably related to the objectives of the search and not excessively intrusive in light of ... the nature of the [misconduct]." *Id.* at 342.

Although at its inception, the videotape search may have been justified to determine whether Plaintiff Helisek was stealing, as argued by Defendants, there are genuine issues of fact as to whether the measures adopted were reasonably related to the objectives of the search. There were other teachers who share the office with Plaintiff Helisek who were not suspected in the alleged thefts. Also, the search may have been excessively intrusive since there is testimony submitted that the office was also used by Plaintiffs and referees to change their clothing. Although Defendants claim that no one saw a video live, Mr. Shelton, the Assistant Principal, testified he inadvertently saw an image from Plaintiffs' office. This statement does not make the search less intrusive since the images were recorded, for at least 30 days. The images could also be copied or burned onto a CD. The reason given for the installation of the camera was to "catch" Plaintiff Helisek in the act of stealing. What then is the purpose of video taping the office if no one is watching the monitor or reviewing the recorded images? Plaintiffs have sufficiently shown that they have a constitutional right to be free from unreasonable video searches of their shared office.

### c. Clearly Established Right

The Court finds that based on the 1987 Supreme Court case of *O'Connor* noted above, Plaintiffs, as public employees, had a clearly established right to be free from unreasonableness

searches by their employer and supervisor. Although neither the Sixth Circuit nor the Supreme Court have specifically addressed the role of video surveillance in an school office or locker room context, the Court notes that *O'Connor* clearly established that a public employee does have a constitutional right to be free from unreasonable searches by their public employer. "Video" surveillance is merely a method used in the search.

It is noted that Plaintiffs submitted on February 22, 2008, after briefing and oral arguments held in this matter, a recent Sixth Circuit case on video surveillance in a school locker room, *Brannum v. Overton County School Board,* 516 F.3d 489 (6th Cir. Feb. 20, 2008). Although the case is persuasive, this Court has relied on the *O'Connor* case to reach its decision. However, the Court finds that the *Brannum* case is on point and may be applied to school district employees as well as students.

The *Brannum* case involved a video installation and surveillance in a boys' and girls' locker rooms in a middle school. The Sixth Circuit held that video surveillance is inherently intrusive and significantly invaded the students' reasonable expectations of privacy in the locker rooms. *Id.* at 496-97. The Sixth Circuit further held that although neither the Supreme Court nor the Sixth Circuit has specifically addressed the applicability of video surveillance to the Fourth Amendment's proscription against unreasonable searches, "[s]ome personal liberties are so fundamental to human dignity as to need no specific explication in our Constitution in order to ensure their protection against government invasion." *Id.* at 494-95, 499. The Sixth Circuit went on to state,

> Stated differently, and more specifically, a person of ordinary common sense, to say nothing of professional school administrators, would know without need for specific instruction from a federal court, that teenagers have an inherent personal dignity, a sense of decency and self-respect, and a sensitivity about their bodily privacy that are at the core of their personal liberty and that are grossly

offended by their being surreptitiously videotaped while changing their clothes in a school locker room. These notions of personal privacy are "clearly established" in that they inhere in all of us, particularly middle school teenagers, and are inherent in the privacy component of the Fourth Amendment's proscription against unreasonable searches. But even if that were not self-evident, the cases we have discussed, *supra*, would lead a reasonable school administrator to conclude that the students' constitutionally protected privacy right not to be surreptitiously videotaped while changing their clothes is judicially clearly established.

*Id.* at 499.

Based on the above analysis, Defendant Shenkman is not entitled to qualified immunity. Defendant Shenkman was the official who contacted the security director to effectuate the placement of two cameras in Plaintiffs' office. (Ball Dep., p. 26) Summary judgment is denied on Plaintiffs' § 1983 Fourth Amendment claim against Defendant Shenkman.

### 2.     Municipal Liability

Defendants argue that Defendant Dearborn Public Schools must be dismissed since Plaintiffs cannot show that the Board of the Dearborn Public Schools had any knowledge of Defendant Shenkman's installation of the cameras nor can Plaintiffs show the Board had a policy with regard to the placement of video cameras in the teachers' office.

Plaintiffs respond that there is a question of fact whether Defendant Dearborn Public Schools had a policy of using covert cameras to detect theft, attaching the District's policy on "Plant Security" to their brief as Exhibit K. Plaintiffs also attach Mr. Rafferty's deposition which Plaintiffs claim demonstrates that the District has used covert cameras to detect theft in a school classroom.

In order for a municipality to be liable under Section 1983 there must be some evidence that "execution of [the] government's policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the injury." *Monell v.*

*Department of Social Services*, 436 U.S. 658, 694 (1978). "[A] municipality cannot be held liable solely because it employs a tortfeasor-or, in other words, a municipality cannot be held liable under § 1983 on a respondeat superior theory." *Id.* at 691. Generally, the doctrine of *respondeat superior* has no application in a § 1983 claim absent an allegation that the defendants were following the government's policies or customs. *Dunn v. Tennessee*, 697 F.2d 121, 128 (6th Cir. 1982). Rather, "the touchstone of the § 1983 action against a government body is an allegation that official policy is responsible for a deprivation of rights protected by the Constitution." *Monell,* 436 U.S. at 690. The Supreme Court has indicated that "municipal liability may be imposed for a single decision by municipal policymakers under appropriate circumstances." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 480 (1986). However, "an 'official policy' is one adopted by someone with 'final authority to establish municipal policy *with respect to the action ordered.*' " *Hull v. Cuyahoga Valley Joint Vocational Sch. Dist. Bd. of Educ.,* 926 F.2d 505, 515 (6th Cir.1991) (quoting *Pembaur,* 475 U.S. at 481) (emphasis added). In other words, "[l]iability for unauthorized acts is personal; to hold the municipality liable, *Monell* tells us, the agent's action must implement rather than frustrate the government's policy." *Id.* Moreover, a municipal employee is not a "final policymaker" unless his decisions "are final and unreviewable and are not constrained by the official policies of superior officials." *Feliciano v. City of Cleveland,* 988 F.2d 649, 655 (6th Cir.1993).

Plaintiffs have failed to establish that the Dearborn School District, through its Board, had a custom or policy of installing video cameras in staff offices and/or locker rooms. Exhibit K to Plaintiffs' brief is the District's "Plant Security" Policy. The premise of the Policy is that the buildings of the District are a financial investment of the District and that the buildings and equipment owed by the Board shall be protected from theft and vandalism. (Ex. K, Plant Security)

The Policy authorizes the Superintendent to develop and supervise security of the buildings, grounds and equipment, including video surveillance equipment in appropriate areas in District facilities. (Ex. K., Plant Security) This Policy does not show that the Defendant School District, through its Board, had a policy of installing video cameras in staff offices and/or locker rooms to detect thefts of individual personal items. The Policy focuses on theft and vandalism of District property.

Mr. Rafferty's deposition also does not show that the Defendant Dearborn School District had a policy of installing video cameras in staff offices and/or locker rooms to detect thefts. The one occasion noted by Mr. Rafferty in his deposition involved a camera in a classroom, not a staff office or a locker room. (Rafferty Dep., p. 36)

Plaintiffs have not shown that the Defendant Dearborn School District had a policy or custom of placing video surveillance in staff offices and/or locker rooms to detect theft. The § 1983 claim against Defendant Dearborn School District is dismissed.

### C. State Law Claims

#### 1. Governmental Immunity, M.C.L. § 691.1407(1), Dearborn School District

Defendants claim that the Defendant Dearborn School District is immune from tort liability under M.C.L. § 691.1407(1). In response, Plaintiffs claim that Defendant Dearborn School District was not performing a governmental function when it covertly videotaped Plaintiffs' activities.

Tort immunity is broadly granted to governmental agencies pursuant to M.C.L. § 691.1407(1), which provides:

> Except as otherwise provided in this act, a governmental agency is immune from tort liability if the governmental agency is engaged in the exercise or discharge of a governmental function.

M.C.L. § 691.1407(1). A governmental function is an activity expressly or impliedly mandated or

authorized by the constitution, statute, or other provision of law. *Ross v. Consumers Power Co. (On Rehearing),* 420 Mich. 567, 620 (1984). The immunity granted by the statute to a municipality is based upon the general nature of the activity of its employees, rather than the specific conduct of its employees. *Smith v. Dep't of Public Health,* 428 Mich. 540, 608 (1987), aff'd sub nom *Will v. Michigan Dep't of State Police,* 491 U.S. 58 (1989). As the *Smith* Court noted, "to use anything other than the general activity standard would all but subvert the broad governmental immunity intended by the Legislature. . . . [I]t would be difficult to envision a tortious act that is a governmental function." *Smith,* 428 Mich. at 609. Also, there is no exception in the governmental immunity statute, M.C.L. § 691.1407(1), for intentional torts. *Id. See also Bischoff v. Calhoun Co. Prosecutor,* 173 Mich. App. 802 (1988).

As noted by the Michigan Supreme Court in *Smith,* the general activity standard of its employees, rather than the specific conduct of its employees, must be used to determine whether a municipality or agency is immune under the statute. The general activity of Defendant Dearborn Public Schools is to educate. The focus is not on the specific activity of Defendant Shenkman. Defendant Dearborn Public School is entitled to governmental immunity under M.C.L. § 691.1407(1) of all the state law claims against it, including the negligence and intentional tort claims: Statutory Violation, M.C.L. § 750.539d (Count I); Invasion of Privacy (Count II); Intentional Infliction of Emotional Distress (Count III); and Gross Negligence (Count V). *See, Stoll v. City of Detroit,* 2002 WL 393486 (Mar. 12, 2002) (unpublished) (Applying governmental immunity to invasion of privacy and intentional infliction of emotional distress claims); *Burke v. Detroit Public Schools,* 2006 WL 1156366 (May 2, 2006) (unpublished).

**2. Governmental Immunity, M.C.L. § 691.1407(2), Defendant Shenkman**

Defendants also claim that Defendant Shenkman is entitled to governmental immunity under M.C.L. § 691.1407(2). Plaintiffs respond that Defendant Shenkman is subject to individual liability since she is not the highest level official in the District.

An employee of a governmental agency acting within the scope of his or her authority is immune from tort liability unless the employee's conduct amounts to gross negligence that is the proximate cause of the injury. M.C.L. § 691.1407(2); see also *Robinson v. Detroit,* 462 Mich. 439, 462 (2000). Actions of a governmental employee that would normally be considered an intentional tort are also shielded from liability if those actions were "justified," i.e., objectively reasonable under the circumstances. *Butler v. Detroit,* 149 Mich. App 708, 715 (1986); see also *VanVorous v. Burmeister,* 262 Mich. App 467, 480 (2004). Gross negligence is defined as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results," M.C.L. § 691.1407(7)(a), and has been held to suggest an "almost willful disregard of precautions or measures to attend to safety and a singular disregard for substantial risks." *Tarlea v. Crabtree,* 263 Mich. App 80, 90 (2004). Accordingly, evidence of ordinary negligence does not create a material question of fact concerning gross negligence. *Maiden v. Rozwood,* 461 Mich. App 109, 122-23 (1999). To satisfy the causation requirement, the defendant's conduct must be "the one most immediate, efficient, and direct cause" of plaintiffs' injuries. *Robinson,* 462 Mich. at 462.

For the reasons set forth previously in the Fourth Amendment analysis portion of this opinion and below addressing the specific state law claims, Defendant Shenkman is not entitled to governmental immunity. Defendant's action in authorizing the placement of the cameras in Plaintiffs' office and/or locker room was "the" proximate cause of Plaintiffs' injuries.

### a.  Statutory Violation, M.C.L. § 750.539d - Count I

Defendant Shenkman claims that the statute, M.C.L. § 750.539d does not impose civil liability, citing *Harkey v. Abate,* 131 Mich. App. 177 (1983). In response, Plaintiffs claim that the statute expressly presupposes civil actions for the violation of the statute, arguing that the *Harkey* court noted that M.C.L. § 750.539d "does constitute, at a minimum, a legislative expression of public policy opposed to [the installation of viewing devices] in a public restroom. Plaintiffs claim that *Lewis v. LeGrow*, 258 Mich. App. 175 (2003) supports their argument that they have a civil cause of action under the statute.

Although *Harkey* notes that M.C.L. § 750.539d does not specifically impose civil liability for a violation of the statute, the *Harkey* court fails to acknowledge M.C.L. § 750.539i which states, "[i]n any criminal or *civil* action, proof of the installation in any private place of any device which may be used for the purposes of violating the provisions of this act shall be prima facie evidence of a violation of section 539d." M.C.L. § 750.539i. The court in *Lewis* recognized M.C.L. § 750.539i when it noted, "[s]ection 539d, together with M.C.L. § 750.539i, creates a criminal and civil cause of action for invasion of privacy, which Michigan has long recognized as a common-law tort." *Lewis,* 258 Mich. App. at 183. The *Lewis* case involved an action under M.C.L. § 750.539d and the common-law tort of invasion of privacy, where the jury found in favor of the plaintiff on all theories of liability, including a violation of M.C.L. § 750.539d and the common-law tort of invasion of privacy. *Id.* at 182. Based on the express language in M.C.L. § 750.539i and *Lewis*, the Court finds that Michigan law imposes civil liability under M.C.L. § 750.539d. For the reasons set forth in the Fourth Amendment claim analysis, the Court finds that Plaintiffs have stated a violation of M.C.L. § 750.539d, in that Plaintiffs had a reasonable expectation of privacy in their offices and/or locker room. Defendant Shenkman is not entitled to governmental immunity on Plaintiffs' claim under

M.C.L. § 750.539d.

### b.       Invasion of Privacy (Intrusion Upon Seclusion) - Count II

Defendant Shenkman argues that Plaintiffs cannot establish a *prima facie* case on their invasion of privacy claim because Plaintiffs cannot demonstrate that they had a right of privacy in changing clothes in their office.

In order for Plaintiffs to state a cause of action based on an invasion of privacy claim, they must demonstrate: 1) an intrusion; 2) into a matter in which the Plaintiffs had a right of privacy; and, 3) by means that would be objectionable to a reasonable person. *See Lewis v. Dayton-Hudson Corp.,* 128 Mich. App. 165 (1983).

Plaintiffs have stated a *prima facie* case for the reasons set forth above in the Fourth Amendment claim analysis. Defendant Shenkman intruded by placing two video cameras in Plaintiffs' office in which Plaintiffs had a right of privacy and reasonable persons would object to such video surveillance, in light of the testimony that Plaintiffs and referees changed in and out of their clothing in this space. Defendant Shenkman is not entitled to governmental immunity on Plaintiffs' invasion of privacy claim.

### c.       Intentional Infliction of Emotional Distress - Count III

Defendant Shenkman argues that Plaintiffs cannot state a claim for intentional infliction of emotional distress. Plaintiffs claim that they have stated sufficient facts to create a question of material fact.

In order for Plaintiffs to state a claim for intentional infliction of emotional distress they must show: "(1) extreme and outrageous conduct, (2) intent or recklessness, (3) causation, and (4) severe emotional distress." *Graham v. Ford,* 237 Mich. App. 670, 674 (1999). Plaintiffs have created a

genuine issue of material that Defendant Shenkman's actions of video taping Plaintiffs could constitute extreme and outrageous conduct while Plaintiffs undressed, that such actions were intentional or reckless, that the actions caused severe emotional distress upon Plaintiffs. Defendant Shenkman is not entitled to governmental immunity on Plaintiffs' intentional infliction of emotional distress claim.

### d. Gross Negligence - Count V

Defendant Shenkman argues that Plaintiffs cannot demonstrate that Defendant Shenkman was grossly negligent when she authorized the use of the video surveillance of the Plaintiffs' office. Plaintiffs argue in response that Defendant Shenkman admitted she never thought about the privacy of Plaintiffs when she conducted the surveillance of Plaintiffs' office. Plaintiffs claim that Defendant Shenkman's testimony makes it clear that she had absolutely no concern whatsoever for the constitutional, statutory and common law rights of Plaintiffs.

Gross negligence is defined as "conduct so reckless as to demonstrate a substantial lack of concern for whether an injury results." *See* M.C.L. § 691.1407(2)(c). Based on Defendant Shenkman's testimony, there is a question of fact as to whether her conduct of covertly video taping Plaintiffs' office was so reckless as to demonstrate a substantial lack of concern for Plaintiffs' injuries. Defendant Shenkman is not entitled to governmental immunity as to the gross negligence claim against her.

### III. MOTION FOR LEAVE TO FILE FIRST SUPPLEMENTAL COMPLAINT

Plaintiffs seek to add two counts to their Complaint: Retaliation in Violation of Michigan Public Policy (Count VI) and Deprivation of Due Process (Count VII). Plaintiffs are tenured

teachers with Defendant Dearborn Public Schools.   In Count VI, Plaintiffs claim Defendants retaliated against them for exercising their First Amendment rights by terminating Plaintiff Helisek and continuing discipline of Plaintiff Hummel.   In Count VII, Plaintiffs allege that the "hearings" they received were conducted by Defendants, therefore, such hearings were unfair and biased.

Defendants oppose the amendment arguing that amending the Complaint would change the nature of this action and, since discovery has been completed, a whole new schedule will be necessary and this would unduly delay the judicial process.   Defendants also argue that the claims are futile.

Rule 15(a) of the Rules of Civil Procedures governs motions for leave to amend pleadings, and states in pertinent part that "a party may amend the party's pleading only by leave of court or by written consent of the adverse party; and leave shall be freely given when justice so requires." Fed. R. Civ. P. 15(a).   While this is a liberal standard, the district court need not grant leave to amend if there is evidence of delay, prejudice, or futility.  *Foman v. Davis,* 371 U.S. 178, 182 (1962); *Midkiff v. Adams County Regional Water District,* 409 F.3d 758, 767 (6th Cir.2005); *Inge v. Rock Financial Corp.,* 388 F.3d 930, 937 (6th Cir.2004).

In this case, discovery was closed, dispositive motions were filed three months prior to the Motion for Leave to File First Supplemental/Amended Complaint.   Allowing the Plaintiffs to proceed with their proposed amendment at this juncture would necessitate, at a minimum, the reopening of discovery and another round of dispositive motions on the newly-raised claims, which raises new factual allegations.   The original Complaint stems from the video taping of Plaintiffs in their office/locker room.   The proposed Amended Complaint alleges new factual allegations stemming from Plaintiffs Helisek's termination and the alleged continuing retaliatory discipline of

Plaintiff Hummel. These new factual allegations are separate in time and in the law from those in the original Complaint. Given the substantial prejudice this would impart upon Defendants, the Court finds that the amendment would not be appropriate at this juncture since it would cause both delay and prejudice.

Additionally, the amendment of the Complaint would be futile.

Addressing Count VI, the Retaliation in Violation of Michigan Public Policy claim, which is essentially a First Amendment Retaliation claim based upon the language set forth in the claim, amending the Complaint to add this claim is futile. To establish a *prima facie* case of First Amendment retaliation under 42 U.S.C. § 1983, a plaintiff must demonstrate that: 1) he was engaged in a constitutionally protected activity; 2) he was subjected to adverse action or deprived of some benefit; and, 3) the protected speech was a "substantial" or "motivating" factor in the adverse action. *Leary v. Daeschner,* 349 F.3d 888, 897 (6th Cir. 2003). The court must first determine whether the relevant speech addressed a matter of public concern. *Farhat v. Jopke,* 370 F.3d 580, 588 (6th Cir. 2004). Speech involves a matter of public concern when it involves "any matter of political, social, or other concern to the community." *Leary,* 349 F.3d at 899. This type of speech must be differentiated from a public employee's speech that involves matters of personal interest which are not protected. *Id.* A federal court is not the appropriate forum to review the wisdom of a personnel decision taken by a public agency in reaction to the employer's behavior. *Connick v. Myers,* 461 U.S. 138, 147 (1983).

The proposed Count VI does not identify the "speech" which Plaintiffs rely upon, other than noting that Defendants retaliated against Plaintiffs for their exercise of their constitutional rights. In any event, Plaintiffs' original lawsuit does not support that the lawsuit's focus was on a matter

of public concern.  The allegations in Plaintiffs' original lawsuit focused on obtaining remedies for Plaintiffs' "personal" injuries relating to the video taping of Plaintiffs' office space.  Although video taping in private areas could constitute a public concern, the allegations in Plaintiffs' original complaint focus on Plaintiffs' personal injuries, which is not sufficient to transform Plaintiffs' original lawsuit to a matter of public concern.  Plaintiffs' proposed Count VI would be futile.

Count VII, Deprivation of Due Process, would also be a futile claim.  Plaintiffs admit they received "hearings" but that these hearings were unfair and biased.  Plaintiffs claim they were not provided with the evidence against them and were not given the opportunity to present adequate defenses.  Due process requires some sort of pretermination hearing.  *Farhat,* 370 F.3d at 595.  Due process requires that the public employee be given "oral or written notice of the charges against him or her, an explanation of the employer's evidence, and an opportunity to present his or her side of the story to the employer."  *Buckner v. City of Highland Park,* 901 F.3d 491, 494 (6th Cir. 1988).  The Sixth Circuit has held that in the pretermination state, the employee does not have a right to, and the Constitution does not require, a neutral and impartial decision maker.  *Farhat,* 370 F.3d at 595.

Defendants attached the Disciplinary Hearing Notifications against Plaintiffs Helisek and Hummel which establish that these Plaintiffs received notice of the charges against them.  (Exs. 1 to 6 and 8-15) Defendants also attached an exhibit which shows Plaintiff Helisek filed an appeal with the Tenure Commission from the Defendant Dearborn Public School's determination that Plaintiff Helisek should be terminated.  (Ex. 7) Plaintiffs have failed to state a claim that they are entitled to an impartial decision maker and that they did not have the appropriate notices of the charges against them.  Adding Count VII to the Complaint would be futile.

**IV.     CONCLUSION**

For the reasons set forth above,

IT IS ORDERED that Defendants' Motion for Summary Judgment (**Doc. No. 17, filed November 10, 2006**) is GRANTED IN PART and DENIED IN PART as more fully set forth above. Defendant Dearborn Public School District is DISMISSED. Defendant Shenkman remains as a Defendant.

IT IS FURTHER ORDERED that Plaintiffs' Motion for Leave to File First Supplemental/Amended Complaint (**Doc. No. 22, filed February 26, 2007**) is DENIED.

IT IS FURTHER ORDERED that a Final Pretrial Conference be held in this matter on **Tuesday, May 20, 2008, 2:45 p.m.** The parties must submit their proposed Joint Final Pretrial Order pursuant to E.D. Mich. LR 16.2 by May 13, 2008. All parties with authority to settle must appear at the conference.


s/Denise Page Hood
Denise Page Hood
United States District Judge

Dated: March 31, 2008

I hereby certify that a copy of the foregoing document was served upon counsel of record on March 31, 2008, by electronic and/or ordinary mail.

s/William F. Lewis
Case Manager